**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DANTE A. JETER, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. SAG-21-2828 |
| SHANE R. WEBER, Warden PATRICK O'NEIL, MD, CORIZON HEALTH, INC., and BRENDA REESE, RN, | * * | |
| Defendants. | * | |

\*\*\*

**MEMORANDUM OPINION**

Self-represented plaintiff Dante A. Jeter filed this civil rights action against Defendants Warden Shane Weber, Patrick O'Neil, M.D., Brenda Reese, RN, and Corizon Health, Inc. Comp., ECF No. 1.[1] Jeter alleges that defendants failed to provide him with adequate medical care at Western Correctional Institution ("WCI") because he did not receive wound care following a procedure to excise an infected fragment in his arm. Comp. and Supp. Comp., ECF Nos. 1, 7. Defendants Corizon Health, Inc. and Brenda Reese ("the Medical Defendants") have moved to dismiss or, alternatively, for summary judgment to be granted in their favor. ECF No. 17. Defendant Weber also moved to dismiss the Complaint. ECF No. 19. Jeter filed a single response in opposition to the motions, to which the Medical Defendants filed a reply.[2] ECF Nos. 21, 25. The Court finds that a hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons explained below, the Court will grant the Motions as to Defendants Reese and Weber. As to defendant Corizon Health, the case has been stayed due to Corizon's filing of a suggestion of

---

[1] The Clerk shall be directed to correct the names of the defendants on the docket.
[2] Jeter filed a motion for extension of time to respond together with his response in opposition. ECF No. 22. The motion to extend time will be granted *nunc pro tunc*.

bankruptcy; therefore, Corizon's motion will not be addressed until which time the stay is lifted. ECF Nos. 27, 28.

## Background

Jeter alleges that Defendant Dr. O'Neil removed a "fra[g]ment" from his arm "without doing exam or lab test on the fra[g]ment," and that no wound care or pain management was provided following the procedure resulting in infection and ongoing pain in his arm. ECF No. 1 at 4. With his Complaint, Jeter filed a copy of a response to an Administrate Remedy Procedure ("ARP") request which finds his request meritorious and outlines the repeated failures to provide proper wound care. ECF No. 1-1.

The Medical Defendants submitted the declaration of Defendant Brenda Reese, RN, ECF No. 17-3, and Jeter's medical records for the relevant time period, ECF No. 17-4. The medical records show that Jeter has a history of gunshot wounds to the arm and subsequent repair in 2008. ECF No. 17-4 at 3.

On November 2, 2020, Jeter saw Ezra Kasule, RN complaining of right arm pain and hearing something "pop." ECF No. 17-4 at 3. Kasule found that Jeter's arm was without bruising or redness and had an intact posterior long scar. *Id*. Jeter could bend his arm to 45 degrees without pain. *Id*. Kasule referred Jeter to a provider, but there is no record that Jeter saw a provider following this visit. *Id*.

On May 26, 2021, Jeter saw Amethyst P. Marsh, RN complaining of "pins" coming out of his arm, and a large boil on the right tricep close to the surgical scar. ECF No. 17-4 at 9. On examination, Marsh observed a medium open area on the right tricep with purulent drainage and a small "bulbing" with something in the center piercing through the skin. *Id*. Marsh cleaned the wound, applied a dressing, and referred Jeter to a provider "ASAP." *Id*.

The next day, on May 27, 2021, Defendant Patrick F. O'Neil, MD saw Jeter for an urgent provider visit. ECF No. 17-4 at 12. Dr. O'Neil suspected a "retained foreign body with infection or inflammation" and discussed excision, including "risks, alternatives, and potential complications including pain, bleeding, scarring, infection, or need for further procedures." *Id*. Jeter gave his informed consent, and Dr. O'Neil proceeded with the excision, which was repaired with six sutures. *Id*. Dr. O'Neil ordered a nurse to follow-up for dressing changes daily for three days and a provider follow-up in five days for wound check and suture removal. *Id*. Dr. O'Neil also recommended no showering for three days and prescribed a three-day course of Bactrim. *Id*.

On June 6, 2021, Breanna L. Brown, RN saw Jeter for an unscheduled visit after she was informed by the housing unit that Jeter's dressing was bloody and needs changing. ECF No. 17-4 at 14. Brown found a "scant amount of serous drainage" and noted the wound bed was pink. *Id*. Brown cleansed the area, applied a large bandage, and gave Jeter four large bandages to change on his own. *Id*.

On June 7, 2021, Jeter submitted a sick call request stating that his right arm is in "serious pain, also my stitches come out of my wound on my arm that's causing me serious [] pain." ECF No. 17-4 at 34. The response to the sick call request, dated June 15, 2021, states that Jeter was referred to a provider and seen the same day. *Id*.

On June 15, 2021, Jeter saw Aaiysa N. Ansari-Lawal, MD for an urgent provider visit. ECF No. 17-4 at 15. Jeter reported persistent purulent drainage and tenderness of the wound, but no fever or chills. *Id*. A nurse cleansed the wound, took a wound culture specimen, and dressed the wound with a bandage. *Id*. Per Dr. Ansari-Lawal, the nurse also administered Rocephin mixed with lidocaine to the deltoid area. *Id*. Jeter's sutures were removed during this visit. *Id.* at 16. After observing no reaction in twenty minutes, Jeter was released back to his housing unit. *Id*. Dr.

3

Ansari-Lawal's plan was to order daily wound care and dressing changes; prescribe Tylenol, doxycycline, and Keflex; and see Jeter in one week.  *Id*.  If there was no improvement after one week, Dr. Ansari-Lawal planned to place a surgical consult or transfer to the ER for wound exploration.  *Id*.

On July 22, 2021, Jeter saw Vincent O. Nwuzor, RN for a chronic care visit with complaints of right arm pain.  ECF No. 17-4 at 19-20.  Jeter stated that his medications were not ordered and the ibuprofen was not working.  *Id*.  An examination of Jeter's arm found that it was painful with movement and warm to touch, but there was no discoloration, numbness, or swelling.  *Id*.  Nwuzor referred Jeter to a provider.  *Id*.

On August 30, 2021, Jeter saw Howard P. Cook, MD for a provider visit.  ECF No. 17-4 at 23.  Jeter was complaining of chronic pain in his right arm as well as limitations due to being right-handed.  *Id*.  On examination, Dr. Cook noted a gunshot wound to the inside of the right arm.  *Id*. at 24.  The bullet had come out the other side of the arm, damaging the arm.  *Id*.  In addition, Dr. Cook noted that Jeter's pinky finger had been shot off.  *Id*.  Dr. Cook submitted a consult request for orthopedics, stating that Jeter's arm sometimes locks up and will not bend properly and he has decreased grip strength.  *Id*. at 21.

On September 27, 2021, Jeter saw Dr. Cook again for further examination of his arm as requested by utilization management.  ECF No. 17-4 at 25.  A detailed examination of the arm found a 13-inch scar on the back of the arm from near the deltoid in back, over the triceps, and down almost to the elbow.  *Id*. at 26.  The arm was numb near the deltoid, and Jeter could straighten it to only 160 degrees regularly and sometimes to only 145 degrees.  *Id*.  Jeter described severe pain during various movements of the arm.  *Id*.  The arm locks up in front of him in a bent fashion,

and his right grip strength is significantly reduced compared to the left. *Id*. Dr. Cook resubmitted the consult request to utilization management. *Id*.

On October 12, 2021, Jeter underwent an x-ray of his right elbow which showed no acute osseous abnormality, post-surgical hardware was in place, and multiple small metallic foreign body fragments were observed along the distal humerus. ECF No. 17-4 at 35.

On December 7, 2021, Jeter saw Adane T. Negussie, PA for a scheduled provider visit regarding the ongoing pain in his right arm. ECF No. 17-4 at 28. Negussie noted that Jeter had seen Dr. Rishi Bhatnagar at Precision Orthopedics on October 28, 2021, with no further recommendations other than to continue current management. *Id*. Dr. Bhatnagar administered an injection to Jeter's right elbow, but it made the pain worse rather than better. *Id*. Jeter reported that he was taking other inmates' Tramadol for the pain. *Id*. Upon examination, Negussie found tenderness and moderate pain with motion in the right elbow. *Id*. at 29. He renewed prescriptions for Baclofen and Norvasc.³ *Id*.

## Legal Standards

### A.   Federal Rules of Civil Procedure 12(b)(6) and 56(a)

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The court may "consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic[.]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir.

---

3 Baclofen is a muscle relaxant and antispastic; Norvasc is used to treat hypertension. *See* https://www.dailymed.nlm.nih.gov/dailymed/index.cfm (last visited March 3, 2023).

2007) (citation omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

The Medical Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a).  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-

37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because the Medical Defendants filed a motion styled as a motion to dismiss, or in the alternative, for summary judgment, Jeter was on notice that the Court could treat the Motion as one for summary judgment and rule on that basis.

### B. Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively,

7

the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King,* 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr*., 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

**Discussion**

**A.  Defendant Warden Shane Weber**

Defendant Weber moves to dismiss the Complaint, arguing that it does not state a claim against him because there is no allegation that Weber was responsible for the alleged failure to provide proper medical care and that he cannot be held liable under § 1983 without allegations of personal participation.  ECF Nos. 19, 19-1 at 4-5.  Further, Weber argues that review of Jeter's administrative remedy procedure requests does not amount to personal participation in the alleged constitutional violations.  ECF No. 19-1 at 6.

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Without subjective knowledge, a prison

official is not liable. *Farmer v. Brennan,* 511 U.S. 825, 846 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998). Denial of a plaintiff's ARP requests and appeals does not alone impose liability. *Whitington v. Ortiz,* 307 Fed, Appx. 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek,* 240 Fed. Appx. 777, 780 (10th Cir. 2007) (unpublished); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation).

Jeter's allegations against Warden Weber are simply that "[o]n May 27, 2021, the last state to so call stop slavery "Maryland" allow Warden at [WCI] under constitutional law allow, a Corizon Health Inc employee to fail in providing adequate medical care." ECF No. 1 at 4. Jeter attaches a copy of the response to his administrative remedy procedure request finding his request meritorious because he did not receive wound care following the procedure to extract the bullet fragment from his arm. ECF No. 1-1. The response is signed by "B. Butler." *Id*. In response to Weber's motion to dismiss, Jeter states only that "[t]here are multiple genuine material disputes where the Warden of W.C.I in his supervisory role, found in WCI-0908-21 that the Plaintiff's request for administrative remedy [was] meritorious." ECF No. 21. Jeter has not alleged any facts that would support an allegation of supervisory liability on the part of Weber. The extent of Jeter's allegations against Weber is that he "allowed" the inadequate medical care to occur, but he does not provide any facts to support that Weber knew about the inadequate care and failed to take action to ameliorate it. Furthermore, to the extent Jeter suggests that Weber knew of the issues due to his ARP that was found meritorious, the meritorious response was not signed by Weber; therefore, there is no evidence that he was aware of any problem with Jeter's care. Accordingly, Weber's Motion to Dismiss will be granted.

### B. Brenda Reese, RN

Jeter asserts that Reese was responsible for his not receiving wound care because she is the head nurse responsible for ensuring medical staff follow policies, procedures, and orders. Supp. Comp., ECF No. 7 at 2.  In response to the Medical Defendants' Motion, Jeter states that "Defendants' Motion is a work of fraud, misrepresentation of factual elements, and ignores Brenda Reese's responsibility to ensure that nurses under her supervision were properly trained and qualified to operate within the prison industrial complex." ECF No. 21.  Effectively, Jeter's allegations against Reese are for supervisory liability.  However, he does not allege that Reese had any actual or constructive knowledge that her subordinates were acting in a manner that posed an unreasonable risk of injury to Jeter.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  While Reese admits to being the Regional Director of Nursing during the relevant time period, she blames the lack of wound care on administrative errors made by both Drs. O'Neil and Ansari.  Reese Decl., ECF No. 17-3 at ¶¶ 2, 9.  Reese states that as a result of these errors, "[n]ursing was not aware that wound care was ordered on either visit." *Id*. at ¶ 9.  Reese further explains that:

> [she] was never personally involved in this patient's care and was not aware that he was not receiving ordered wound care.  Although I was responsible for overseeing the nurses while I was employed as the DON, the nurses did not do anything wrong in this case.  They never performed any wound care because no actual order for wound care was submitted by the providers.  The medical providers are responsible for ordering wound care.  Nurses are responsible for transcribing the order, and then the onsite scheduler is then responsible for scheduling the wound care to be done daily.  If the providers do not enter orders in the proper place, nurses and the pharmacy do not see those orders.

*Id*. at 10. While this system, wherein nurses rely on doctors' data entry skills to determine what patient care is necessary, is troubling, there is nothing in the record to suggest that Reese herself was responsible for this flawed procedure.  The record shows that she was responsible for overseeing the nurses who implemented the procedure, and nothing more.  Reese states that she

11

had no personal involvement with Jeter's care, and he does not contest that fact. Thus, nothing suggests Reese was responsible for the failure to provide Jeter with wound care either via supervisory liability or through her own personal involvement. Accordingly, she is entitled to summary judgment in her favor.

### C.  Dr. Patrick O'Neil

Service was not accepted on behalf of Dr. O'Neil, therefore, the Complaint against him remains unserved. Nevertheless, the Complaint must be dismissed against him pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. Jeter alleges that Dr. O'Neil "decide to cut deep into [Jeter's] arm, to remove a fra[g]ment without doing exam or lab test on the fra[g]ment that was leaking threw [sic] a lump in plaintiff right arm." Comp., ECF No. 1 at 4. The Complaint does not explain what specific exam or lab test should have been conducted nor what harm Jeter suffered as a result. The crux of the Complaint is that Jeter failed to receive wound care following the procedure, but it does not allege that Dr. O'Neil was responsible for this failure. As such, Jeter has not stated a claim against Dr. O'Neil and the Complaint against him shall be dismissed.

### Conclusion

For the foregoing reasons, Defendant Weber's Motion to Dismiss is granted; the Medical Defendants' Motion, construed as a motion for summary judgment, is granted as to Defendant Reese; and the Complaint is dismissed as to Defendant O'Neil. A separate Order follows.

March 7, 2023                                                     /s/
Date                                                                      Stephanie A. Gallagher
                                                                                United States District Judge